Filed 7/26/23  In re Kasey D. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KASEY D., a Person Coming Under the Juvenile Court Law. | B321963<br>(Los Angeles County Super. Ct. No. 22CCJP01534) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JANYCE E.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Janyce E. (Mother) appeals from the juvenile court's jurisdiction findings and disposition order declaring two-month-old Kasey D. a dependent of the court and removing her from Mother's physical custody. The juvenile court sustained a petition under Welfare and Institutions Code former section 300, subdivision (b)(1),[1] alleging Kasey had a positive toxicology

---

[1] Welfare and Institutions Code section 300, subdivision (b)(1), formerly provided, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." Effective January 1, 2023, Senate Bill No. 1085 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 832, § 1) amended section 300 by rewriting subdivision (b)(1) to enumerate the existing bases for dependency jurisdiction in separate subparagraphs (b)(1)(A) through (D). The legislation also added section 300, subdivision (b)(2), which now provides, "A child shall not be found to be a person described by this subdivision solely due to any of the following: [¶] (A) Homelessness or the lack of an emergency shelter for the family. [¶] (B) The failure of the child's parent or alleged parent to seek court orders for custody of the

screen for marijuana at birth, and Mother had a history of substance abuse and was a current abuser of marijuana that rendered her incapable of providing regular care and supervision of Kasey and placed Kasey at risk of serious physical harm. Mother contends there was insufficient evidence of substance abuse and there was no nexus between Mother's marijuana use and a present risk of harm to Kasey. Mother also contends the juvenile court abused its discretion in restricting Mother to monitored visitation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Referral and Investigation*

Kasey was born in April 2022 at Providence St. Joseph Medical Center in Burbank. She was born prematurely at 34 to 35 weeks and was placed in the neonatal intensive care unit. The same day Kasey was born, the Los Angeles County Department of Children and Family Services (Department) received a referral alleging Mother tested positive for marijuana and admitted to using psychedelic mushrooms, and Kasey also tested positive for marijuana at birth. Mother, who was then 22 years old, had not received prenatal care, did not have any supplies for a baby or a support system to care for a newborn, and would not have assistance from Kasey's father (who was not aware of Mother's

---

child. [¶] (C) Indigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare."

Further statutory references are to the Welfare and Institutions Code.

pregnancy). The hospital medical staff expressed a concern about Mother's ability to care for Kasey due to Mother's lack of preparation, in utero drug exposure, and lack of a place for Mother and Kasey to live upon discharge.

The next day Evelyn Fuenzalida, a hospital social worker, confirmed that Mother and Kasey had positive urine tests for marijuana, but the testing only showed that Mother and Kasey tested positive, not the levels of marijuana metabolites detected. According to Fuenzalida, Mother showed love toward Kasey and appeared to be a "nice person," but Mother was unsure about parenting a baby and concerned about her lack of financial stability. As a result, she was considering placing Kasey up for adoption. Neonatal care nurse Tony Ervolina stated Kasey was eating and sleeping well and had no withdrawal symptoms.

The Department social worker interviewed Mother in her hospital room on the day of her discharge. Mother stated Kasey's father had the first name "'Antonio,'" but she did not know his last name or have his contact information. He was living in Florida and worked at the same company where Mother used to work. Mother felt Antonio was "'not ready to be a father,'" and she had not told him she was pregnant. Mother explained she had been living on her own since she was 17 years old and moved from Florida to California in January 2022. Mother had no family or friends in California to help her with Kasey. She had been living with two roommates, but she had to move out because the lease had expired. Mother first became aware she was pregnant when she was five months pregnant and started to show. She did not receive prenatal care and had no health insurance or a primary care doctor. At the time of the interview, Mother was working the graveyard shift in a warehouse.

4

Mother stated she frequently used marijuana for her anxiety and had last used a "'small bowl'" the prior Saturday (the day before Kasey was born). Mother knew "'not to use'" marijuana while pregnant, but she nonetheless used it to calm her anxiety. Mother told the social worker she was physically, emotionally, and verbally abused as a child by an adoptive parent, and had early in her life been diagnosed with anxiety.

With respect to the use of psychedelic mushrooms, Mother stated a friend had given her a chocolate bar infused with mushrooms sometime the prior week, but Mother was unaware it contained psychedelic mushrooms. Mother had not previously ingested psychedelic mushrooms. Mother denied having a criminal record and said she did not consume alcohol.[2] Mother refused to take an on-demand drug test upon discharge from the hospital, stating she would be too busy moving her belongings out of her former residence. Kasey was due to be discharged in the next day or two, and Mother told the social worker she would decide by then whether she would care for Kasey or consent to a safe surrender of Kasey to the Department.

The next day Mother told the social worker that she had obtained a second job for the daytime, and she had temporary access to transportation. Mother stated as to Kasey, "'[U]nfortunately, I won't be able to keep [Kasey][;] I won't have the time to be able to take care of her. I really don't want to put her through me struggling . . . .'" Mother told the social worker that evening that she had decided to place Kasey "temporarily"

---

[2] In a subsequent interview, Mother also denied use of any substance other than marijuana and her one-time use of mushrooms.

with the Department while she stabilized her life and financial situation.  Mother handwrote and signed an affidavit surrendering Kasey to the Department.  Mother advised the social worker she would visit Kasey at the hospital the following day before Kasey was discharged.

Fuenzalida reported the next day that Mother had been breastfeeding and was bonding with the baby.  The Department social worker contacted Mother to clarify the plan for Kasey's care.  Mother stated, "'The best option is to have time to get myself together and unravel the current situation,'" but she wanted the arrangement to be temporary.  The social worker informed Mother a court case would begin and recommended Mother comply with the court's orders to reunify with Kasey.  Further, Mother could contact Kasey's caregiver to arrange for visits with Kasey.  The social worker asked Mother to provide contact information for relatives or friends to serve as possible placements, but Mother said she did not have any contact information to provide.  A housing navigator offered Mother a place to stay in a shelter for a week while the Department looked into additional housing resources, but Mother declined the assistance.

B.    *The Dependency Petition and Detention Hearing*

On April 21, 2022 the Department filed a dependency petition alleging pursuant to section 300, former subdivision (b)(1), that Kasey was born suffering from a detrimental condition, having tested positive for marijuana at birth, which resulted from Mother's conduct that placed Kasey at risk of physical harm.  The petition further alleged Mother had a history of substance abuse, including marijuana, and was a

6

current abuser of marijuana, which rendered Mother incapable of providing Kasey with regular care and supervision. The petition cited to Mother's use of marijuana during her pregnancy and her positive drug test at the time of Kasey's birth. Further, "[t]he child is of such a young age as to require constant care and supervision," and Mother's substance abuse interfered with her ability to provide regular care and supervision and placed Kasey at risk of serious physical harm.

At the April 26 detention hearing, Mother's attorney stated Mother was unhoused and, as to detention, "Mother is unsure if she is able to or even wants to keep Kasey, so at this time I will submit on detention." But she clarified that Mother wanted to reunify with Kasey and was willing to participate in services and drug testing. The attorney added, "[Mother] does use marijuana medicinally and she understands that she may need to decrease her levels." The court detained Kasey[3] and granted Mother monitored visits two to three times per week for two to three hours each visit, with the Department having discretion to liberalize visitation. The court cautioned if Mother appeared for a visit under the influence of drugs or alcohol, the visit would be canceled. The court ordered the Department to provide Mother with a referral for drug testing. The court told Mother as to drug testing, "Please go ahead and test even though you will come up positive for marijuana. I know that marijuana is a legal substance like alcohol is, but what I look for is how high are your levels, and if they are high[,] are you able to bring those levels

_____

[3] The juvenile court found Antonio was Kasey's alleged father and detained Kasey from him because he had not been fully identified and had not appeared.

7

down . . . ."  Mother responded, "Yes."  The court also ordered Mother not to breastfeed until she provided five consecutive clean drug tests.  The court ordered the Department to provide housing and transportation assistance to Mother.

C.    *The Jurisdiction and Disposition Report*

The jurisdiction and disposition report filed on May 20, 2022 stated Kasey was living with caregiver Kelsey A.  On May 13 the dependency investigator interviewed Mother about the drug abuse allegations in the petition.  Mother stated she began using marijuana when she was 18 years old to "'self-medicate'" to manage her anxiety.  When Mother realized she was pregnant during the fifth month of pregnancy, she initially stopped using marijuana, then reduced her use from "'throughout the day'" to "'probably use[d] 2 hours during the day.'"  Mother continued to use marijuana because it was a stressful time as a result of her finances and the prospect of having a baby.  Mother stated marijuana use "'does not affect my everyday process [and] I don't use while I work[;] I use after I'm off.  When I [have] used I'm [by] myself and it does not interfere with my ability to care for my daughter."  Mother did not think Kasey's testing positive for marijuana at birth "'would be considered abuse.'"

Mother had two part-time jobs and was currently living out of a small truck.  Mother acknowledged she was currently unable to provide for Kasey's basic needs, but she hoped in the future to move back to Florida with friends who were aware of her situation.  Mother stated her childhood environment was traumatic.  She was placed in foster care as a young child, then adopted by her aunt, after her mother's partner killed Mother's younger sibling.

8

Mother was referred by the Department to drug testing on May 4, 2022 and failed to show for scheduled tests on May 5 and 11. As to the latter date, Mother explained she was confused about the testing instructions. On May 12 Mother tested positive for marijuana metabolites at 416 ng/mL. Mother tested negative for all other drugs. According to the last minute information for the court, on May 20 Mother tested positive for marijuana metabolites at 85 ng/mL, and she failed to show for a test on May 24, 2022. On June 3 Mother tested positive for marijuana at 95 ng/mL.

Kasey was doing well and appeared to be meeting developmental milestones. She was seen weekly by a physician, and there were no concerns with her growth and development. Kasey's birth records stated there were "'[n]o complications at birth except both mother and infant toxicology positive for [c]annabinoids."

On April 29 Kasey's caregiver and Mother agreed to conduct visits in person on Sundays at a park, with two virtual visits on weekdays. However, Mother never participated in weekday virtual visits with Kasey. Mother was unable to attend an in-person visit on Sunday, May 8, and instead had a five-minute virtual visit that day. On May 15 Mother visited with Kasey in the park. The caregiver reported that Mother appeared to be detached and needed support and training in how to care for Kasey, as shown by Mother not burping Kasey and needing to be told when Kasey needed a diaper change. Mother's May 22 visit was reduced to one hour because Mother failed to confirm the visit 24 hours in advance, as the parties had agreed, and the caregiver was unavailable for the usual two-hour visits. The May 29 visit was canceled because Kasey was sick. The June 5

9

visit did not take place because Mother failed to confirm with the caregiver in advance.

As of the June 14 last minute information for the court, Mother had not enrolled in any services. Mother stated she had not found a parenting program that offered virtual sessions, and she needed flexibility because she was working two jobs and had no transportation.

D.    *The Jurisdiction and Disposition Hearing*

At the June 14, 2022 jurisdiction and disposition hearing, the juvenile court sustained the petition. The court explained, "Mother, at some point, did know she was pregnant and thought it was okay to continue using marijuana. Marijuana is a legal substance, but it appears Mother is dependent on it; that she . . . still needs to use it daily and that she uses it for her emotional needs and that she uses another drug, [psychedelic] mushrooms, which [is] also a hazard. Mother is not recognizing how fragile an infant is or how fragile the infant was during gestation and that the use of a substance like marijuana or mushrooms can affect her child. And it requires a real change . . . . [S]he needs to be able to show that she isn't using it every day and that she can make an arrangement where her use and her being under the influence will not [occur] when she will have the child in her care." The court found Mother failed to "show an ability to stop using [marijuana] on a daily basis." And, although Mother's "levels are low," Mother's "daily use and the lack of Mother. . . being able to see how this harms her child and her ability to parent" supported jurisdiction. The court found additional factors supporting jurisdiction included that Mother did not have a "stable life" with support, and she was "lacking

10

certain basic skills and things in her life that her newborn will need."[4]

As to disposition, the juvenile court relied on the Department's reports and the court's jurisdiction findings to declare Kasey a dependent of the court. With respect to removal, minor's counsel stated Kasey's placement with Kelsey was working well and the caregiver was sympathetic to Mother's situation and assisted Mother in maintaining contact with Kasey. Mother's attorney stated, "Mother would like release; however, she does not have a place for the child to be released to. But per Mother's request, I'm offering a possibility that was proposed by Mother, although she understands this is unlikely, but she is asking that the Department . . . assess Mother living with the caregiver with the child. I know that nobody has approached the caregiver about this either, but per my client's request, I'm asking the court to assess this possibility."

The juvenile court stated Kelsey would not be released to Mother "until Mother can show she can avoid using marijuana on a daily basis, that is the level of control I need to see, and that she is able to make a plan for her child to have a safe home, and Mother demonstrate[s] that she understands the basics of

---

[4] As discussed, effective January 1, 2023, section 300, subdivision (b)(2)(C), now provides that jurisdiction cannot be based on the parent's indigence and inability to provide a home for the child. Although Mother's inability to provide financial support and shelter for Kasey would not be a sufficient ground for jurisdiction under current law, Mother's continued use and abuse of marijuana, and her lack of insight into the effect of her substance abuse on her ability to care for Kasey, were sufficient grounds.

parenting." (RT 16:21-26)~ The court concluded returning Kasey to the home of Mother was "contrary to the baby's welfare." The court found, "There is clear and convincing evidence that there is or would be a substantial danger to the baby's physical health, safety, protection, or wellbeing if returned home of Mother, and there are no reasonable means by which the baby's physical health can be protected without removing from Mother." The court added, "[M]y removal findings are based on clear and convincing evidence that Mother is not yet able to control her use of marijuana to the point where she . . . will be sober while around the baby."[5]

With respect to Mother's case plan, the juvenile court asked Mother's attorney whether she had any objection to the Department's proposal. The attorney replied, "I think it looks okay to me as well." Consistent with the Department's proposal,[6] the court ordered Mother to submit to random or on-demand drug testing on a weekly basis; if Mother tested positive for higher levels of marijuana or another substance, or missed any tests without an excuse, the Department was ordered to bring this to the attention of the court, which would then consider ordering Mother to participate in a full drug treatment program. The court also ordered Mother to complete a developmentally

---

[5] The juvenile court also ordered Kasey removed from Antonio, after the Department filed a declaration of diligence stating it had been unable to identify or locate him.

[6] The juvenile court rejected the Department's recommendation Mother undergo a psychiatric evaluation, but it agreed to order Mother to follow her therapist's recommendation if the therapist deemed a psychiatric assessment necessary.

appropriate parenting program; mental health counseling; and individual counseling to address case issues, substance abuse and its effect on children, childhood trauma, mental health, coping strategies, and child safety. The court granted Mother monitored visits two to three times per week for two to three hours each visit, with the Department having discretion to liberalize visitation. The court ordered the Department to provide housing and transportation assistance for Mother, and for Kasey to be assessed at a regional center.

Mother timely appealed.

## DISCUSSION

A.  *Substantial Evidence Supports the Jurisdiction Findings Under Section 300, Former Subdivision (b)(1)*

    1.  *Governing law and standard of review*

The juvenile court has jurisdiction over a child if the Department establishes by a preponderance of the evidence that the allegations made pursuant to section 300 are true. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) As relevant here, section 300, former subdivision (b)(1), authorizes the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and

13

physical and emotional well-being of the child."  (§ 300.2, subd. (a).)

"A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole. L.*); accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re R.T.* (2017) 3 Cal.5th 622, 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)  Although section 300 requires the child be at risk of serious harm at the time of the jurisdiction hearing, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child."  (*Cole L.*, at pp. 601-602; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"].)  If there is reason to believe the conduct will continue, a parent's past conduct may be probative of current conditions.  (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

We review the juvenile court's jurisdiction findings for substantial evidence in light of the record as a whole.  (*In re I.C.* (2018) 4 Cal.5th 869, 892; *In re R.T., supra*, 3 Cal.5th at p. 633 ["'In reviewing the jurisdictional findings and disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.'"].)  Substantial evidence is "evidence which is

reasonable, credible, and of solid value." (*In re I.C.*, at p. 892; accord, *Cole L., supra*, 70 Cal.App.5th at p. 602.) "'[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.*, at p. 633; accord, *In re I.J., supra*, 56 Cal.4th at p. 773; *Cole L.*, at p. 602 ["while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding"].) The appellant has the burden to show there is not substantial evidence to support the juvenile court's findings or order. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

> 2.  *Substantial evidence supports the juvenile court's jurisdiction findings*

Mother contends that although there was evidence she used marijuana during and after her pregnancy, there was insufficient evidence of substance abuse, which is necessary to support dependency jurisdiction. Mother is correct that a parent's use of marijuana, without more, is insufficient to support jurisdiction under section 300, subdivision (b). (*In re J.A., supra*, 47 Cal.App.5th at p. 1046 ["[t]he law is clear that jurisdiction must be based on substance *abuse*; mere substance *use* is not sufficient for jurisdiction" (Boldface omitted.)]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 ["[i]t is undisputed that a parent's use of marijuana '*without more*,' does not bring a minor within the jurisdiction of the dependency court" (Boldface omitted)].) In this case, there is more. Substantial evidence

15

supported the juvenile court's finding Mother's marijuana use was substance abuse.

Mother principally relies on *In re Drake M.* (2012) 211 Cal.App.4th 754, 766 (*Drake M.*), disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 282, for its definition of substance abuse. In *Drake M.*, Division Three of this district held that "a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM–IV–TR."[7] (*Drake M.,* at p. 766). But as we explained in *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218 (*Christopher R.*), although the *Drake M.* formulation provides "a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b)," it is not "a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court." We rejected the mother's argument that "only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser." (*Ibid.*) We also recognized that in 2013, after *Drake M.* was decided, the DSM-IV-TR's definition of "substance abuse" was replaced in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5)

---

[7] DSM-IV-TR refers to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000). (*Drake M., supra,* 211 Cal.App.4th at p. 765.)

16

by a more broadly defined classification of "'substance use disorders,'" which combines substance abuse and substance dependence. (*Christopher R.*, at p. 1218, fn 6.) We stated, "DSM-5 identifies 11 relevant criteria, including cravings and urges to use the substance; spending a lot of time getting, using, or recovering from use of the substance; giving up important social, occupational or recreational activities because of substance use; and not managing to do what one should at work, home or school because of substance use. The presence of two or three of the 11 specified criteria indicates a mild substance use disorder; four or five indicate a moderate substance use disorder; and six or more a severe substance use disorder." (*Ibid.*)

Here, Mother admitted to using marijuana regularly for four years (her entire adult life) to manage her anxiety. Even after she learned she was pregnant, she only reduced her usage from "'throughout the day'" to two hours per day. She knew at the time she should not use marijuana while pregnant, and she had not obtained a prescription or medical advice to support her use. Yet she continued to use marijuana to "'self-medicate'" and cope with the additional stress of her finances and having a baby. On the Saturday before giving birth, Mother admitted to using a "small bowl" of marijuana, and both Mother and Kasey tested positive for marijuana at birth. Moreover, Mother continued to use marijuana after Kasey's birth even though the social worker, and later the juvenile court at the detention hearing, advised Mother that stopping (or consistently reducing her use) was critical to creating a safe home for Kasey, and Mother could not visit Kasey while under the influence. Further, Mother was advised she could not resume nursing Kasey until she had five consecutive clean tests.

17

Following the detention hearing, Mother tested positive three times (and never tested negative). Although Mother's levels dropped from 416 ng/mL on May 12, 2022 to 85 ng/mL on May 20, and 95 ng/mL on June 3, she missed tests on May 5, May 11, and May 24. Mother's missed tests support a reasonable inference she would have tested positive at higher levels. (See *In re Natalie A.* (2015) 243 Cal.App.4th 178, 186 [missed drug tests supported "reasonable inference . . . that father's marijuana use was more frequent than the one admitted instance"]; *Christopher R., supra*, 225 Cal.App.4th at p. 1217 [missed drug test "properly considered the equivalent of a positive test result"].) During this period, Mother was visiting with Kasey, including a visit on May 15, just three days after Mother tested at a high level. Mother's lack of insight into the effects and consequences of her continuing marijuana use, her reliance on marijuana, and her apparent inability to curtail her use reasonably supported a finding of substance abuse.

Mother relies on *In re J.A., supra*, 47 Cal.App.5th at pages 1046 through 1047, in which Division Five of this district held that a mother's use of marijuana edibles while pregnant, resulting in positive tests for both the mother and baby at birth, was insufficient evidence of substance abuse to support jurisdiction under section 300, subdivision (b). But in *In re J.A.*, there was no evidence the mother continued to use marijuana after testing positive at the time she gave birth: "The evidence of mother's substance use is, at most, that she used edible marijuana while pregnant, to address her pregnancy symptoms, after having researched that it was a relatively safe alternative. She claims that she was never high or under the influence when she used it. She claims that she easily stopped using as soon as

18

she was told to do so; her drug tests support this." (*In re J.A.*, at p. 1047.) Unlike the mother in *In re J.A.*, Mother continued to use marijuana for two hours a day, even smoking a small bowl days before delivery, and she did not ever test clean for marijuana or demonstrate her ability to function without it.

Mother also contends there was insufficient evidence to establish her marijuana use created a present risk at the time of the jurisdiction hearing of substantial harm to Kasey, who was healthy and meeting developmental milestones. However, with respect to a child of "tender years," "'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.'" (*Christopher R., supra*, 225 Cal.App.4th at p. 1219; accord, *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.) Kasey was only two months old at the time of the jurisdiction hearing, and the juvenile court's finding Mother was a current abuser of marijuana created a presumption unrebutted by Mother that she would be unable to provide appropriate care for Kasey. (*See Christopher R.*, at pp. 1219-1220 [father's "regular, ongoing use of marijuana" demonstrated "an inability to provide regular care" to his three-month-old daughter].) Although Kasey did not show signs she was harmed by Mother's prenatal use of marijuana, the court need not wait until Kasey was seriously harmed by Mother's continued use of marijuana to assume jurisdiction to protect her. (*Cole L., supra*, 70 Cal.App.5th at p. 602.)

B.    *Substantial Evidence Supports the Removal Order*

    1.    *Governing law and standard of review*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 264-265; see § 361, subd. (c)(1).) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B., supra*, 26 Cal.App.5th at p. 332; accord, *In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review,

20

the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; see *In re V.L., supra*, 54 Cal.App.5th at p. 155 ["*O.B.* is controlling in dependency cases."].) We review the entire record to determine whether the removal order is supported by substantial evidence. (*In re I.R., supra*, 61 Cal.App.5th at p. 520; *In re V.L.*, at p. 155.)

> 2. *Substantial evidence supports the juvenile court's removal order*

Mother contends there was insufficient evidence to support Kasey's removal from her physical custody and there was at least one reasonable alternative to removal.

Contrary to Mother's contention, the same evidence that supported the jurisdiction findings provides substantial evidence to support the juvenile court's finding of clear and convincing evidence that Mother was unable to control her marijuana use to safely care for Kasey. Mother voluntarily surrendered Kasey to the Department out of a concern she could not care for her; she continued to use marijuana after Kasey's birth; and she declined the Department's offers of services and support. Further, she had no family or friends who could support her in caring for Kasey, she was inconsistent in confirming and attending visits with Kasey (resulting in only two in-person visits with her, one of which was shortened to one hour), and her behavior during the visits did not demonstrate a present ability to care for Kasey. Although the Department's reports indicated Mother was well-

21

intentioned with a sincere desire to have a relationship with Kasey, the focus of section 361 is on the parent's ability "to provide proper care for the child" and the "potential detriment to the child" from living with the parent. (*In re N.M., supra*, 197 Cal.App.4th at p. 169.)

Mother contends there were less drastic alternatives to removal, but she suggested only one alternative: the possibility of Mother moving into the home of the caregiver. And as Mother's counsel admitted at the jurisdiction hearing, "nobody has approached the caregiver about this," and Mother knew it was an "unlikely" prospect. Without any evidence the caregiver was willing and able to have Mother live in her home, Mother did not present a "reasonable" alternative to removal at the disposition hearing. (*In re D.P., supra*, 44 Cal.App.5th at p. 1068.) As Mother's attorney acknowledged at the disposition hearing, Mother wanted to have Kasey released to her, but she did "not have a place for the child to be released to."

C.      *Mother Forfeited Her Challenge to the Requirement She Have Only Monitored Visitation*

Mother contends the juvenile court abused its discretion in mandating that her visitation be monitored. But Mother did not object to the visitation order at the disposition hearing, which was based on Department's proposed case plan. When the juvenile court asked Mother's attorney whether she had any objection to the Department's proposal, the attorney responded, "I think it looks okay to me as well." Under these circumstances, Mother forfeited her objection to monitored visitation. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have

been but was not made in the trial court"]; *In re E.A.* (2012) 209 Cal.App.4th 787, 791 [father forfeited his contention the juvenile court erred in denying visitation while he was incarcerated by failing to raise it in the juvenile court]; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 641 [mother "waived her right to assert error as to sibling visitation on appeal by not properly raising the issue below"].)

Even if Mother's contention was not forfeited, the juvenile court did not abuse its discretion.  Section 362.1, subdivision (a)(1)(A), provides, "'Visitation shall be as frequent as possible, consistent with the well-being of the child.'"  (See *In re D.P., supra*, 44 Cal.App.5th at p. 1070.)  But "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B); see *In re T.M.* (2016) 4 Cal.App.5th 1214, 1218.)  "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion."  (*In re D.P.*, at p. 1070.)

Mother continued to test positive for marijuana during the period she was visiting with Kasey, including positive tests within a few days before and after her May 15, 2022 visit. Mother was unsure how to care for Kasey during the visits, including needing the caretaker's guidance with respect to burping and changing Kasey's diaper.  Mother's attorneys have emphasized Mother's youth, inexperience, and lack of support and resources, all of which are true, but these factors, if anything, militate in favor of monitored visits to protect Kasey.  The juvenile court was therefore well within its discretion in requiring a monitor be present during Mother's visits.

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.